THOMAS, PLAINTIFF IN ERROR, v. THE PEOPLE OF THE
    STATE OF COLORADO, DEFENDANTS IN ERROR.

**CRIMINAL NEGLIGENCE.**

Criminal responsibility will attach for the grossly negligent performance
    of a lawful act, but the neglected duty must be a plain one concern-
    ing which there is a general consensus of opinion, and the party
    charged must have been under some contractual or legal obligation
    to perform that which he omitted to do, and the omission to per-
    form it must have been so grossly negligent that the law will im-
    pute criminal intent.

*Error to the Criminal Court of Arapahoe County.*   .

Mr. T. M. PATTERSON, for plaintiff in error.

Mr. J. H. MAUPIN, attorney general, for defendants in
error.

BISSELL, J., delivered the opinion of the court.

D. G. Thomas was jointly indicted with Fay and O'Hara
for the killing of four men in December, 1888.

It is now quite universally conceded that there may be a
criminal responsibility for the grossly negligent performance
of a lawful act.   Law writers and jurists agree as to what
must be disclosed by the proof in order to hold an individual
criminally liable for the death of another, when aside from
considerations of negligence the act would otherwise be law-
ful.   When the defendant is accused because of his neglect
to do a particular thing the duty must be a plain one, re-
quiring no discussion to establish its obligatory force, and
concerning it there must be a general consensus of opinion.
It is likewise essential that the party charged must be obli-
gated to do what he omitted to perform by the terms of some
contract by which he is bound, or the law must have cast on
him the obligation of performance.   *United States v. Knowles,*

4 Sawyer, 517; *Reg. v. Hughes*, 7 Cox's Criminal Law Cases, 301; *Rex v. Green*, 7 Carr. & P. 155 (32 Eng. Common Law, 548, 549); 2 Wharton Criminal Law, § 1002; Cooley on Torts, p. 84.

Manifestly the proper resolution of the present inquiry mainly depends on an accurate ascertainment of what Thomas was bound to do, the extent of that obligation and what negligence, if any, was exhibited in his acts.

In December, 1888, The Denver Gas Company, a corporation operating in the city of Denver, was engaged in relaying its pipes along 15th street. Before this company commenced its work, the Denver Tramway Company, which was also a corporation operating in the city of Denver, had constructed a line of cable railway along that street. This cable road had been built in the ordinary way. The slot line through which the grip runs, and the surface rails along which the wheels move, rested on iron yokes bedded in cement, with the usual sewer pipes and drip boxes connected. Above the cement bed in which the yokes rested, and which was the basis of the structure, the course of the road had been filled with earth to the surface, and it was paved between the rails. This structure covered the gas main as it was laid beneath the surface for a portion of its general circumference. The gas main was from one to two feet below the bottom of the cement bed. To overcome the difficulties readily apparent from this situation, the Gas Company commenced to move the pipe and to place it outside of the line of the railway, presumably for the purpose of safety and convenient repair. It is not apparent from the testimony whether the plan adopted for the change was determined on by the governing board of the corporation, or whether it was left entirely to the superintendent and managing engineer Fay, who was a codefendant. Whichever is true, this fact remains: that the execution of the plan and the mode of doing the work was left to his sole determination, and was executed directly under his orders. Thomas had nothing whatsoever to do in any of these particulars. The removal

of the pipes was accomplished substantially in this wise :—A long trench some two and one half feet wide was dug along the line of the railway, and outside of a perpendicular produced by a line running at right angles with the surface of the tracks to the required depth. The work had been done for quite a long distance on 15th street without misadventure or mishap. At the time of the act, which is charged to have been a felonious killing, a trench of this description had been run between Tremont street and Court place on 15th street for a distance of probably 150 feet. As is usual in such cases, the work was done by a large gang of men distributed along the line who worked in sections of from eight to ten feet, as they might happen to lay out their own work ; each man taking about the same amount. The trench was not of uniform depth. It was quite superficial at one end, and at the other it varied from four to five and one half feet. The cars were running while the trench was being dug. It was an uniform practice, however, for the men to leave the trench whenever a car was passing.

We now come to the point concerning which there are more serious differences in the testimony than concerning any other one proposition of fact in the case, and that is, as to the extent, if at all, to which the digging had been carried underneath the cement bed of the railway, in the direction of the location of the gas main, and towards the center of gravity of the superstructure. We conclude from the testimony that very little digging had been done in that direction. The pipe was exposed in a few places along the trench as a result of the explorations which were made by the men to find out just exactly where the gas main was. The main, however, was not exposed for any considerable portion of its surface, nor for any considerable distance along the line. It was only for short distances and for small spaces that these prospecting holes had been run by the workmen. It is evident to our minds, as it was to the minds of the engineers who testified, that there was no such amount of digging underneath the superstructure of the railway as would be liable,

in the judgment of any prudent man, to jeopardize the safety of that structure. While this conclusion is fully sustained by the testimony of the witnesses both for the people and for the defendant, none of whom dispute it, it was and is probably an erroneous. deduction, since this happened : After the passage of the last car preceding the accident, the entire railway structure, from the cement bed to the surface, careened from its location to the further bank of the trench, and at the point of the greatest bend caught and killed four men.

This statement of facts plainly suggests the accuracy of the antecedent suggestion as to the question to be resolved. To fasten any criminal responsibility upon Thomas it is indispensable to demonstrate that he omitted to do something which he ought to have done, or that he did that which he should not have committed, in such a grossly negligent way that the law would impute to him the criminal intent, which is the essential ingredient of all crime. This cannot be done. Taking the two elements in the inverse order, Thomas did no act which resulted in the killing. It was not shown either that he was negligent in the direction of the construction of the ditch, nor that anything which he did with reference to that construction was negligently done, and that from such negligence the accident resulted. In the first place it was not in evidence that he was directed to do what, if done, would have protected the workmen, and that he failed to do it, or did it in a negligent fashion. In this connection it may be broadly stated that Thomas was intrusted with the determination of nothing which concerned the construction of the ditch. The plan was devised, its mode of execution determined on, its location fixed, its depth and method of construction settled, by the engineer and managing superintendent, Fay. With none of these things did Thomas have aught to do ; he was simply a gang boss intrusted with the naked execution of his principal's orders and without any discretion with reference to any of the particulars of that

execution. It is clear then that Thomas cannot be held because of any performance, negligent or otherwise.

It only remains to determine whether Thomas omitted to do anything which he ought to have done, and for which omission he can be charged with the gross negligence essential to the commission of the crime. The evidence discloses nothing. It was not in evidence that he had received orders from Fay to do what might, if executed, have probably contributed to the safety of the workmen, nor did it appear that the adoption of any other plan for the removal of the pipes, or the construction of the ditch, would have tended to the probable greater safety of the employees. Of course it is evident that if the ditch had been dug in shorter sections, and had been braced at short and repeated intervals, the lamentable result would not have happened. But it was not shown that orders to do any of these things were given to Thomas, that he failed to execute them or executed them negligently, nor was it shown that there was left to him any such discretion as would have warranted that method of performance on his part. In other words, it may be well said that according to the testimony Thomas did what he was told to do and that only; that he executed his orders with fidelity to his employers, and without any such negligence on his part as raises the necessary presumption of a criminal intent.

Upon either of the propositions suggested, it is evident that this conviction cannot stand. The relations which Thomas bore to the work were such as to necessarily preclude any possibility of criminal responsibility, unless evidence be produced which shall demonstrate that he received orders which he failed to execute, or executed with such gross negligence as to cast on him a liability for the death of the unfortunate men who were killed.

Numerous other errors are assigned and argued by counsel for the plaintiff in error, some of which would of necessity compel a reversal of this judgment of conviction. Those which are at all important rest upon erroneous instructions as to the law given by the court. It would be useless to

prolong this opinion for the purposes of discussing the assignments of error based on them. They consist mostly of inaccuracies in phraseology and the statements of rules which are inapplicable to trials of this description, and are not likely to be followed or overlooked should any further action be taken in the case.

Since the judgment of conviction is unsupported by the testimony and by the law, the judgment must be reversed.

*Reversed.*

REED, J., not sitting.