(*Criminal Court of Cook County.*)

### The People of the State of Illinois

vs.

### William J. Davis.

(January 23, 1906.)

</div>

1. FIRE APPARATUS—DUTY TO PROVIDE. There is no duty at common law requiring the owner or occupant of a building to provide fire-escapes and fire apparatus.

2. PLACES OF AMUSEMENT—DUTY TO PROVIDE SAFE PLACE. Proprietors of places of amusement are bound to provide a safe place for their patrons and to exercise reasonable care for their safety.

3. DUTY—NECESSITY OF. Where there is no duty imposed either by law or contract upon a particular person to do a particular act, no penalty can be imposed upon him for its non-perform-

[1] See also *People v. Davis, et al.*, 1 Ill. C. C. 217, for a contrary decision on a prior indictment for the same offense.—Ed.

ance. The duty must be a plain one and the person who must perform it must be specifically designated.

4. STATUTES—ORDINANCES—DUTY TO UPHOLD. It is the duty of courts to so construe all legislative enactments as to uphold their validity if it can reasonably be done.

5. ORDINANCES—DUTY TO COMPLY WITH. Although an ordinance providing for the installation of certain fire apparatus in buildings of a certain class fails to designate the person who shall perform the duty, it is a violation of the ordinance to use and occupy a building constructed in violation of the law, without complying with the ordinance.

6. ORDINANCE—INVALID, WHERE SUBJECT TO APPROVAL OF NON-OFFICIAL BODY. Where an ordinance, which provides that every building of a certain class shall be equipped with a fire sprinkler equipment, makes the installation of such equipment subject to the approval of a non-official body, the requirement in regard to such approval is invalid.

7. SAME—WHETHER ENTIRE ORDINANCE INVALID. Where an ordinance is entire, and each part has a general influence over the rest, and one part of it is void, the entire ordinance is void. The void part of the ordinance makes the whole ordinance void if the void and valid parts are so connected as to be essential to each other. If the invalid part can be separated from the other provisions of the law, and the purpose and intent of the legislature remains plain and effective, the invalid part may be disregarded.

8. SAME. The provision in the ordinance requiring the approval of the non-official body may be disregarded without impairing in any degree the purpose or usefulness of the law.

9. CAUSA PROXIMA NON REMOTA SPECTATUR. It is elementary that to establish liability for the doing of an unlawful act, the wrong must be the direct and proximate cause of the injury.

10. SAME—MANSLAUGHTER—VIOLATION OF ORDINANCE OR STATUTE. The mere violation of an ordinance or statute whereby death ensues does not of itself subject the wrongdoer to punishment for manslaughter.

11. MANSLAUGHTER—COMMISSION OF UNLAWFUL ACT. A person cannot be held liable for the crime of manslaughter merely because at the time of the killing he was engaged in an unlawful act, unless the unlawful act or omission was in its nature wrongful independent of statutory enactment, or unless the natural consequences of the unlawful act or omission are dangerous to life or limb, or the act is *malum in se*.

12. PROXIMATE CAUSE OF DEATH—FAILURE TO SUPPLY FIRE-ESCAPES. Where an ordinance providing that theaters shall be supplied

with fire apparatus and equipment is not complied with, and a fire breaks out and death is caused, the failure to comply with such ordinance is the proximate cause of the death.

13. NEGLIGENCE—VIOLATION OF ORDINANCE. The violation of an ordinance is *prima facie* evidence of negligence.

14. MANSLAUGHTER—LUE CAUTION AND CIRCUMSPECTION—QUESTION FOR JURY. It is a question for the jury to determine whether the defendants used due caution and circumspection in failing to equip a theater with fire apparatus and equipment as required by law, whereby death is caused.

Indictment for manslaughter. Motion of defendant to quash. Heard before Judge Marcus A. Kavanagh.

Statement of facts.

The defendant was the manager of the Iroquois Theatre in Chicago, and president and director of the Iroquois Theater Company. On December 30, 1903, a fire broke out upon the stage of the theatre among the scenery, and 600 persons who were witnessing a performance were suffocated and burned. The defendant was indicted for manslaughter, for failure to properly equip said theatre with fire apparatus, etc. The indictment contained six counts. Counts 1, 2, 3 and 4 are based on an alleged non-compliance with certain ordinances of the city of Chicago. Counts 5 and 6 are based upon an alleged common-law duty.

Count one alleges that on December 30, 1903, there were certain ordinances of the city of Chicago, defining and prescribing the fire limits of the city, classifying the buildings therein, and requiring buildings of Class V to have a flue pipe over the stage, with a switch operating the dampers of the same, and a system of automatic sprinklers, to be supplied with water from a tank above the roof, and portable fire extinguishers, axes and hooks, upon the stage; that buildings of Class V should employ an expert fireman; that the owners, lessees and managers of every such building should cause a diagram of the building to be printed on programs; and providing a penalty for a violation of the provisions of the ordinance.

That the Iroquois Theatre was planned, constructed and

built, and operated and used for the purpose of giving theatrical performances, spectacles and plays, and contained on the stage in said building movable and stationary scenery; that the building also contained a large auditorium and assembly hall, with seats, and a ticket office, where tickets were sold for compensation; that the said building was one of Class V, and within the fire limits as prescribed by the ordinances; that Davis was president and managing director of the Iroquois Theatre Company, and general manager of the building for and on behalf of the Iroquois Theatre Company, and in absolute management and control of the building with full power and authority to open, close, manage, direct and do all other things, and that he as such president, director and manager of the Iroquois Theatre Company, and general manager of the building was producing, permitting to be produced, having produced and causing to be produced a play entitled ''Mr. Bluebeard, Jr.;'' that he invited the public to enter the building and witness the play, for compensation; that movable and stationary scenery, electric lights, combustible draperies, etc., were used in producing the play; that there was among the scenery, etc., a *fire* which spread rapidly because of the combustible scenery, etc., and produced smoke, heat, gas and flame; that the laws and ordinances aforesaid required certain apparatus, equipment, appliances, etc., and it was the duty of Davis as president, director and general manager of said corporation, and as general manager of the building and theatre to so equip the building, and Davis as such officer was authorized and empowered to thus equip the building, and he undertook so to do; that as Davis well knew, there was not over said stage a flue pipe, extending not less than 15 feet above the roof, and not a flue pipe having an area not less than one-thirtieth of the area of the stage, and not flue dampers, and not a switch, etc., and not a system of automatic sprinklers supplied with water from a tank located not less than twenty feet above the building, and not sprinklers above and below the stage, and not on stage or in fly galleries or any place in the building portable extinguishers, hand fire pumps, fire department axes and not fire-hooks on each tier of floor of stage

or building; and that Davis did negligently fail and omit to have in and about said building or theatre or on the stage the matters aforesaid required by the laws and ordinances of Chicago. That one Viva R. Jackson was among the persons assembled in said theatre to witness said play, etc., and that on December 30, 1903, Davis, while being, and as the president, director and general manager of the Iroquois Theatre Company, and the manager of the said building and theatre for and on behalf of said company, and as manager of said stage and building and theatre, and in possession and management and control of said theatre, building and stage, did unlawfully, negligently and feloniously and without due caution and circumspection make an assault, in and upon said Jackson while within said theatre and witnessing the play; that the fire could have been extinguished, etc., had there been fire extinguishers, fire pumps, automatic sprinklers, fire hooks and axes in the theatre as required by the ordinances, and by reason of the lack of these, the fire was not and could not be put out; that by reason of the lack of flue dampers and switches, etc., the fire was not and could not be confined to the stage, and by reason of the lack of sprinklers and tank the fire was not and could not be extinguished, nor could the smoke, flame, etc., go off through the roof over the stage, and that Davis by not providing the things aforesaid as required by the ordinances did unlawfully, negligently and feloniously cause a large amount of fire, heat, smoke, gas and flame to issue, pour and go over the stage and over, against and upon the persons assembled in the theatre, and by reason of the smoke, etc., so issued and thrown over and upon her, the said Jackson was mortally burned and asphyxiated, suffocated, strangled and choked and did die on December 30, 1903, which was then and there caused by the negligence of Davis in not seeing that there were provided the things required by the ordinance and that by then and there not using due caution and circumspection while being engaged in his lawful business as aforesaid, and that Davis did negligently, unlawfully and feloniously kill and slay said Jackson contrary to the statute and against the peace and dignity, etc.

The second count is substantially similar to the first count and is predicated on the same ordinances. Davis is charged as president, director and manager of said corporation and as manager and agent of said building and theatre.

The third count is also similar, except that Davis is charged as owner and occupant of the theatre.

The fourth count alleges that on December 30, 1903, in Chicago, etc., a certain building called the Iroquois Theatre was opened and used for the purpose of producing a theatrical performance, spectacle and play designated as "Mr. Bluebeard, Jr.;" that said building had been planned, constructed and erected for the purpose of producing and giving therein and in the Iroquois Theatre located in said building, certain theatrical performances, etc., and that in said Iroquois Theatre in said building there was a stage erected for the purpose of therein producing plays, etc., the plays, etc., aforesaid; that there was in said building a large number of seats for the seating of persons there congregated to witness the aforesaid theatrical performance, and that there was in said building a ticket office where tickets were sold for compensation to persons to attend the certain performance aforesaid, and that said building was used as an assembly hall for large gatherings of people, and that there was in said building and on said stage movable scenery, which was used for producing the play aforesaid; that said building and theatre was situated within and in the fire limits of the city of Chicago, and was a building of class five within said ordinances, hereinafter set forth. That Davis was engaged in a certain lawful business and act, the business and act of managing generally said building and said Iroquois Theatre therein, and was the general manager of said building; that there was a law and ordinance of said city, duly passed, adopted and promulgated by the city council and mayor which was a valid law prescribing and defining the fire limits of said city, which ordinance is set out in the indictment.

That Davis as manager of said building and theatre was empowered, authorized and invested by the owners of said building to procure and furnish the apparatus, etc., required by

said laws and ordinances; that Davis as general manager of said building did undertake and assume the duty to furnish, supply and equip said building, theatre and stage with the apparatus, etc., required by said laws and ordinances; that Davis as the general manager of said building and theatre was empowered, authorized and directed to open and close said theatre and to provide the things required by said ordinances; that there was not then and there the things required by said ordinances.

That Davis was in charge, management and control of said building for and on behalf of the owner thereof, and had taken upon himself the care, charge, management and control of said building and theatre and the duty of providing the things required by said ordinances; that it was the duty of Davis to use due caution and circumspection for the safety of the persons and lives of the persons there congregated, and to have about said building the things required as aforesaid; that one Jackson was one of the persons assembled therein to witness said performance; that a certain lighted arc lamp being operated on the south side of the stage during the progress of the play aforesaid, was put, placed and kept near a certain drapery on the stage, by reason of which the drapery was ignited, and which fire could have been easily extinguished if there had been in said building and on said stage the appliances, etc., required by said ordinances, and fire extinguishers, and hand pumps; that by reason of the lack of extinguishers and pumps, as aforesaid, and the apparatus required by the ordinances, said fire was not and could not be put out; that by reason of the fire being in said drapery and a large amount of combustible material and scenery being on said stage, as Davis well knew, and being ignited, causing a large amount of fire, smoke, heat, gas and flame to be upon, etc., said stage and that by reason of the lack of flue, dampers and switches the fire, etc. did not and could not go through the roof of said stage, and could not be and was not confined to the stage, and by reason of lack of sprinklers and tank required by ordinances, the fire, heat and flame on the stage could not be put out, and the grand jurors present that

had there been flue, dampers and switches, as aforesaid, a large amount of fire, etc., could and would have gone through the roof over the stage, and could and would have been confined to the stage; and if there had been sprinkler and tank as aforesaid the flames, etc., could have been extinguished and put out by the same; that by reason of lack of appliances required by ordinances, the fire, etc., was not thrown off through the roof over said stage and was not put out and was not confined to said stage.

That Davis by his negligence in not providing and in not seeing provided the appliances, etc., required by ordinances, and by being engaged in his lawful business and act without the due caution and circumspection which was his duty then to use, did unlawfully, negligently and feloniously cause fire, smoke, heat, gas and flame to issue, pour and go from said stage to, towards, against and upon the persons assembled, and upon said Jackson who was then and there mortally burned, etc. and did die; that said death was caused by said negligence of Davis in not providing and seeing provided the apparatus, appliances and things aforesaid for the protection of the life of said Jackson, and by his not using due caution and circumspection, while engaged in his lawful business and act. And so Davis did slay, and kill, etc., contrary to the statute, etc.

Count five alleges that on December 30, 1903, the Iroquois Theatre Company, a corporation, was the owner and occupant of a certain building and theatre before then created, constructed and built by the corporation; that there was a large amount of movable scenery on the stage and a large amount of curtains, etc., used in the production of plays, a large number of "lights," and appliances and equipments of combustible material; that a certain play was being produced during which production there was used, changed, raised, lowered, etc., the said lights, scenery, etc.; that a large number of persons were assembled in said theatre; that Davis was then and there "the president and director and general manager" and the "general manager" of said building on behalf of the corporation; that Davis was "in care, possession, management and control of said building and theatre" for and on behalf

of said corporation; that Davis had before then been "president, general manager and director" of said company at and during the period of construction, etc., and was in control and management of its erection, equipment, etc., for said corporation; that said theatre was not wholly completed and equipped; that Davis opened said building and theatre as a public place of amusement, etc., and invited the public to enter for compensation to witness the production, etc.; that Davis was producing, causing and permitting to be produced and given the said play, etc.; that Davis was empowered and authorized by said corporation to provide for the safety of the lives of said spectators; that Davis on behalf of said corporation undertook to provide for their safety; that it was the duty of Davis to use "due caution and circumspection" for the safety, etc., and to provide a safe place for the persons assembled; that one Jackson was present witnessing said play at the invitation of Davis; that it was the duty of Davis to use due caution and circumspection to provide for the safety of the life and person of the said Jackson and to provide a safe place to witness said play; that because of the large amount of movable scenery, drapery, lights and wires, and of the changing of the same, there was imminent danger of fire by reason of the likelihood of the scenery, etc., being brought in contact with said lights and being ignited by the same, all of which Davis knew or ought to have known; that it was Davis' duty to use due caution and circumspection to provide against fire and to use due caution and circumspection in providing equipment, appliances and apparatus for the purpose of extinguishing any fire which might occur and which was then and there probable; that it was the duty of Davis to use a high degree of care in providing apparatus, appliances and equipment and things to then and there extinguish any fire which might occur; that there was not then and there sufficient apparatus, etc., with which to extinguish or put out a fire which Davis knew; that Davis while so having the care, charge, management and control, upon said Jackson, while witnessing said play, did unlawfully, negligently, feloniously and without due caution and circumspection make an assault, and that a certain light was brought

in contact with a certain drapery which became ignited; that said fire could have been easily extinguished and put out had there been in said building, theatre and stage any fire apparatus, appliances, equipment or things provided for that purpose, but that by reason of the absence and the lack of any such apparatus, appliances, equipment or things, said fire was not and could not be extinguished and put out, and that by reason of said fire the scenery, etc., ignited, which Davis knew was probable in case of a fire; that by reason of said fire a large amount of smoke, etc., was caused to be around said stage, etc.; that by reason of the absence of any apparatus, etc., the said fire, etc., was not extinguished, and could not be confined to said stage, as could have been done had such apparatus, etc., been provided; that said Davis by his negligence in not providing and in not seeing that the said apparatus, etc., was not in said theatre, etc., and by being engaged in the said business and act of so managing, running and operating said building, etc., without due caution, etc., as it was his duty, did unlawfully, etc., cause a large amount of smoke, etc., to pour from said stage upon the said Jackson, and by reason thereof death was caused; that said death was caused by the neglect of Davis by not providing for and not seeing that there was provided the necessary apparatus, etc., for the protection of Jackson against death by fire and by his not using due caution, etc., for the safety of the life, etc., of the said Jackson; that the said Davis did negligently, feloniously and unlawfully kill and slay contrary to the statute.

The sixth count is substantially similar to the fifth count.

A motion to quash the indictment was made, and the motion was overruled as to the first four counts and sustained as to counts five and six.

*John J. Healy,* state's attorney, and *E. C. Lindley,* assistant state's attorney, for the people.

*Levy Mayer,* for defendant.

KAVANAGH, J.:—

The d f nt moves to quash severally the six counts of an indictmei t inst him in each of which is charged the statu-

tory crimes of manslaughter. The first four of these counts are bottomed upon a fire ordinance of the city of Chicago, which prescribes certain fire limits and regulates the kinds of buildings to be therein erected and the manner of their use. For convenience of reference the buildings within the fire limits are divided into classes, as follows:

CLASS I. In this class shall be included all buildings devoted to the sale, storage or manufacture of merchandise, and all stables over 500 square feet area.

CLASS II. This class shall embrace all buildings used as residences for three or more families, all hotels, all boarding or lodging houses occupied by twenty-five or more persons, and all office buildings.

CLASS III. This class shall embrace all buildings used as residences for one or two families or for less than twenty-five persons, and stables under 500 square feet area.

CLASSES IV and V. These shall include all buildings used as assembly halls for large gatherings of people, whether for purposes of worship, instruction or entertainment.

Buildings of Class IV embrace all buildings in which no movable scenery is used upon the stage thereof. Class V embraces all buildings in which movable scenery is used.

In this controversy we are only concerned with Classes IV and V. Concerning these two classes the ordinance further provides:

"There shall be over the stage of every building of Class V a flue pipe of sheet metal construction, extending not less than fifteen (15) feet above the highest part of the roof over the stage of said building—flue shall have an area of at least one-thirtieth of the total area of the stage. The dampers for flue shall be made of metal and opened by a close circuit battery; a switch to be placed in the ticket office and one placed near the electrician's station on the stage, each to have a sign and these words printed on it: 'Move switch to left in case of fire to get smoke out of building' (sec. 184).

"In every building of Class V a system of automatic sprinklers to be supplied with water from a tank located not less than twenty feet above the highest part of roof of build-

ing. Sprinklers shall be placed above and below the stage; also in paint room, store room, property room and dressing rooms, if they are in or connected with Class V building, and not separated by approved double iron doors. Tank not to be connected to stand pipe and ladder systems, but to have separate pipe for filling from fire pump, and a 3-inch pipe extending from tank to outside of building, with siamese connections for fire department use. The entire sprinkler equipment to be approved by the commissioner of buildings, fire marshal and the board of underwriters of Chicago (sec. 185).

"In buildings of Class V and also of Class IV where stationary scenery is used, there shall always be kept for use portable fire extinguishers or hand fire pumps, on and under the stage; in fly gallery and in rigging loft, also at least four (4) fire department axes, two twenty-five (25) feet hooks, two (2) fifteen feet hooks, two (2) ten (10) feet hooks, on each tier or floor of the stage, all subject to the approval of the fire marshal (sec. 188).

"Every portion of any building of Class IV and V devoted to the uses or accommodation of the public, also all outlets leading to the streets, and including the open courts and corridors, stairways and exits shall be well and properly lighted during every performance, and the same shall remain lighted until the entire audience has left the premises (sec. 192).

"It shall be the duty of the owner, lessee or manager of every building of Classes IV and V during the performance of which programs are issued, to cause a diagram showing the exits of such building to be printed on such programs (sec. 186).

"Any person, firm, company or corporation who violates, disobeys, omits, neglects or refuses to comply with, or who resists or opposes the execution of any of the provisions of this ordinance, shall be subject to a fine of not less than $25 nor more than $200; and every such person, firm, company or corporation shall be deemed guilty of a separate offense for every day such violation, disobedience, omission, neglect or refusal shall continue, and shall be subject to the penalty

imposed by this section for each and every separate offense; and any builder or contractor who shall construct any building in violation of any of the provisions of this ordinance, and any architect designing or having charge of such building who shall permit it to be so constructed, shall be liable to the penalties provided and imposed by this section" (sec. 216).

The indictment then charges that there was a certain building and theatre known as the Iroquois Theatre used then and there for the purpose of producing theatrical performances, to which the public were invited and for which an admission was charged; and that there was in this theatre movable scenery, and that there was at the same time stationary scenery, thus bringing the building within Classes IV and V; that there were also a large number of curtains, draperies and borders and drops upon the stage of the theatre in close proximity to a great number of lights, thus creating a danger of fire.

The indictment charges that the building was owned and in the possession of the Iroquois Theatre Company, a corporation, and that the defendant, William J. Davis, was president of the company, and the managing director thereof, and also the general manager of the building and theatre for this company; again it is charged that he himself was the owner of the building; that he was in absolute management and control of the building and theatre with full power to open, close, manage, direct and do all other things with the said building as he then and there might determine; and that he for the corporation was producing and permitting to be produced on behalf of the corporation a certain play; and that on the 30th day of December, 1903, there was assembled to witness this play a great number of persons, to-wit: eighteen hundred in response to the invitation of said William J. Davis, and that there occurred a fire in this theatre which produced a large amount of smoke and heat and gas and flame; and that it was the duty of the said William J. Davis to use due caution and circumspection in equipping, providing and supplying the building with equipment and apparatus required by the ordinances of the city of Chicago.

The indictment further charges that the defendant failed in this duty in that he neglected to provide, first, the flue pipe and its equipment, as above described; second, automatic sprinklers and their accessories, as called for in the ordinance, and third, the portable extinguishers or fire pumps and the other hand apparatus required by the ordinance.

The indictment goes on to declares that one Viva R. Jackson was in the audience so assembled and that by reason of this failure upon the part of the said William J. Davis, Viva R. Jackson was suffocated and burned to death, and that if William J. Davis had fulfilled the requirements of the ordinance as above set forth, that the life of Viva R. Jackson would have been saved, the fire would have been extinguished and the gas and flame and the smoke would have escaped through the roof of said building.

The second, third and fourth counts of the indictment substantially follow the first count; the only material difference so far as the discussion of this question is concerned being in the relations borne by the defendant to the theatre and to the Iroquois Company.

He is charged in the second count in addition to the other relations set forth in the first count, with being the agent of the building and theatre. He is charged in the third count with being the owner and occupant of the building and theatre, and in the fourth count with managing generally the building of the Iroquois Theatre.

The fifth and sixth counts, called in argument for convenience of description common-law counts, charge the defendant with being the president, director and general manager of the Iroquois Theatre Company and general manager of the building; that he was in the possession, management and control of the building. It charged that Davis was producing a play in the theatre and that it was then and there his duty to use due caution and circumspection for the safety of the audience; that because of the large amount of movable scenery, drapery, lights and wire and of the changing of the same there was imminent danger of fire by reason of the likelihood of the scenery and materials being brought into contact with

the lights and being ignited, all of which Davis knew or should have known; and that there was not then and there sufficient apparatus to extinguish or put out a fire, a failure which the defendant knew, and that he failed to furnish such apparatus, and by reason of such failure Viva R. Jackson was killed.

These last counts proceed solely upon the theory that it was the duty of the defendant to provide, irrespective of the ordinance, fire escapes and apparatus for the putting out of a fire. For the purposes of expediency in presentation we may dispose of the objections to these last two counts at this time.

The supreme court of Illinois in the case of *Landgraf v. Kuh,* 188 Ill. 484, says: "The duty of providing fire-escapes did not exist at common law, but has its origin and measure in the statute, requiring that such fire-escapes be placed upon buildings."

In *Arms v. Ayer,* 192 Ill. 601, our court says: "It is equally well settled that at common law there was no liability imposed upon the owner of a building to provide fire-escapes or other means of exit in case of fire, as a general rule, and that for this reason, as well as because of the penal character of the act, it must be strictly construed."

Outside of our own state there seems a practical uniformity of decision upon the question. Opinions to the same effect are found in *Pauley v. S. G. L. Co.,* 131 N. Y. 90, 29 N. E. 999; *Huda v. American Glucose Co.,* 154 N. Y. 474, 48 N. E. 897; *Schmalzreid v. White,* 97 Tenn. 36, 36 S. W. 393; *Jones v. Granite Mills,* 126 Mass. 84; *Keeley v. O'Conner,* 106 Pa. St. 321.

In *Jones v. Granite Mills,* the court says: "The narrow question is presented whether a master is required by the common law so to construct the mill, or so to arrange the place where his servants work, that they shall be protected from the consequences of a casualty for which he is not responsible. We know of no principle of law by which a person is liable in an action of tort for mere non-feasance by reason of his neglect to provide means to obviate or ameliorate

the consequences of the act of God, or mere accident, or the negligence or misconduct of one for whose acts towards the party suffering he is not responsible.   *   *   *   It is no part of the contract of employment between master and servant so to construct a building or place where the servants work that all can escape in case of fire with safety, notwithstanding the panic and confusion attending such a catastrophe.   No case has been cited where an employer has been held responsible for not providing such means of escape.   The construction and arrangement of manufactories and places where large numbers of persons are employed, may be proper subjects of legislative action, and such an act has been passed since this catastrophe.''

It is true that at common law independent of statutory enactment, proprietors of places of amusement owe a duty to exercise reasonable care for the safety of those rightfully upon their premises, but under the above authorities that this foresight is required to .extend to the erection of fire escapes and the provisions of apparatus for the extinguishment of fires, I do not think well established, and therefore the motion to quash counts five and six of the indictment are sustained.

The real difficulty presents itself when we come to consider the first four counts of the indictment.

Section 145 of the Criminal Code provides that: ''Involuntary manslaughter shall consist in the killing of a human being without any intent to do so, in the commission of an unlawful act, or a lawful act, which probably might produce such a consequence, in an unlawful manner: *Provided, always,* that where such involuntary killing shall happen in the commission of an unlawful act, which in its consequences naturally tends to destroy the life of a human being, or is committed in the prosecution of a felonious intent, the offense shall be deemed and adjudged to be murder.''

The first objection made to these counts goes to the ordinance itself.   It maintains that nothing contained in the sections above quoted imposes an act of duty upon any one concerned; that these sections are merely an affirmative expres-

sion of the intent and desire of the legislators, and go no further.

The defendant argues first: That where no duty is imposed by law or by contract no penalty follows its nonfulfillment. That there must be a legal obligation before there can arise a legal duty. In support of the general proposition there are many decisions. The general doctrine is well stated by Justice Field sitting in *nisi prius* in the case of *U. S. v. Knowles,* reported in the 26th Federal cases, page 800. In that case a sailor fell from the mast of his ship into the ocean and the defendant, the master of the ship, could have rescued the sailor Swainson had he stopped his ship, could have lowered either of his boats, but from his negligence and omission in this respect Swanson was drowned. The defendant was indicted for manslaughter, and Judge Field in charging the jury said:

"In the first place the duty omitted must be a plain duty by which I mean that it must be one that does not admit of any discussion as to its obligatory force; one upon which different minds must agree or will generally agree. Where doubt exists as to what conduct should be pursued in a particular case, and intelligent men differ as to the proper action to be had, the law does not impute guilt to any one, if, from omission to adopt one course instead of another, fatal consequences follow to others. The law does not enter into any consideration of the reasons governing the conduct of men in such cases to determine whether they are culpable or not.

"In the second place, the duty omitted must be one which the party is bound to perform by law or contract, and not one the performance of which depends simply upon his humanity or his sense of justice or propriety. In the absence of such obligations it is undoubtedly the moral duty of every person to extend to others assistance when in danger; to throw, for instance, a plank or rope to a drowning man, or make other efforts for his rescue; and if such efforts should be omitted by any one when they could be made without imperilling his own life, he would by his conduct draw upon himself the just cen-

sure and reproach of good men; but this is the only punishment to which he would be subjected by society."

The court further says that in case of a person falling overboard from a ship at sea there is no question as to the duty of the commander. Nothing will excuse him for an omission to take any steps necessary to save a person overboard, provided they can be taken with a due regard for the safety of the ship and others remaining on board, and any neglect to make such effort would be criminal, and if followed by the loss of the person overboard, when he might have been saved, the commander would be guilty of manslaughter.

That the duty must be a specific, personal duty, there can be no doubt. It is so laid down in all the books. Wharton's Criminal Law, sec. 110; *Rex v. Gray,* 4 F. & F. 1098; *Regina v. Pocock,* 5 Cox, C. C. 172; *U. S. v. Eaton,* 144 U. S. 677; *Belk v. The People,* 125 Ill. 584; *Commonwealth v. Watson,* 97 Mass. 562; *Hitchcock v. Chicago,* 72 Ill. App. 196; *Ex parte Railway,* 18 Lower Canada Jurist, 141; *City of Chicago v. Rumpf,* 45 Ill. 90.

Wharton says: "A light-house keeper permits his light to go out and a vessel is consequently wrecked. Is he penally responsible? Certainly so, if he is specially charged with the office of light-house keeper at that point, and if this is the kind of light on which seamen depend for guidance. But supposing a number of persons volunteer in order to warn vessels to keep lights in their windows, the omission of one of these persons to light his windows from which serious mischief ensues, would not be indictable. The same distinction may be applied to parties employed to give fire alarms."

The best illustration perhaps from a court of last resort is contained in the case of *Anderson v. State,* 27 Tex. App. 177, 11 S. W. 33. The defendants in that case were brakemen and were riding upon the engine when one Sing Morgan was struck and killed, and it was charged that if they had used a degree of care and caution in regard to giving signals or keeping lookout which an ordinarily prudent person would have used under like circumstances, the accident would not have happened.

The court says: "These appellants were brakemen; they had no control whatever of the engine and tender. They were riding upon the same for the purpose merely of performing their specific duties as brakemen, which duties had no connection with or relation to the homicide. * * * As we understand both the common law and the statute, there can be no criminal negligence or carelessness by omission to act unless it was the special duty of the party to perform the act omitted."

So in the case of *United States v. Mitchell*, 58 Fed. 993, where the defendant was indicted for refusing to answer questions put to him by the census supervisor, the court held that there was no provision in the act requiring corporations or their officers to answer the questions, and that therefore the defendant was not liable.

In *Thomas v. The People*, 2 Colo. App. 513, 31 Pac. 349, the defendant was indicted because of the caving in of an excavation in the street by reason of which accident four men were killed.

"To fasten any criminal responsibility upon Thomas (the foreman) it is indispensable to demonstrate that he omitted to do something which he ought to have done or that he did that which he should not have committed in such a grossly negligent way that the law would impute to him the criminal intent which is the essential ingredient of all crime. This cannot be done. * * *

"It was not shown either that he was negligent in the direction of the construction of the ditch nor that anything which he did with reference to that construction was negligently done and that from such negligence the accident resulted. * * * He was simply a gang boss, entrusted with the naked execution of his principal's orders and without any discretion with reference to any of the particulars of that execution. * * * When the defendant is accused because of his neglect to do a particular thing the duty must be a plain one requiring no discussion to establish its obligatory force and concerning it there must be a general concensus of opinion. It is likewise essential that the party charged must

be obligated to do what he omitted to perform by the terms of some contract by which he is bound, or the law must have cast on him the obligation of performance."

To the same effect are the following Illinois cases: *Mackey v. Milling Co.*, 210 Ill. 115; *Schueler v. Mueller*, 193 Ill. 402; *R. R. Co. v. Clausen*, 173 Ill. 100.

From these general principles the defendant proceeds to his more direct contention that before a person can be held liable for the violation of such an ordinance he must be specifically designated in the law itself as one obligated to fulfil its requirements. To illustrate: The sections of the ordinance under consideration containing the requirements which are the subject of complaint in this indictment provide "there shall be on the stage of every building" certain appliances and "in every building of Class V a system of automatic sprinklers * * * shall be placed above and below the stage," and again "in buildings of Class V and also IV there shall always be kept for use fire extinguishers, etc.," but who shall supply the automatic sprinklers or other equipment is not set forth in the ordinance, therefore it is contended that the duty not being cast upon the defendant and he being in no manner obligated in terms to provide these appliances, he cannot be made liable for their absence.

In contradistinction to the sections quoted, it is further provided that "it shall be the duty of the owner, lessee or manager * * * to cause a diagram of such building to be printed on the programs." Here it is pointed out the owner, lessee or manager is named in the section itself, a precaution which is not taken in the sections before cited.

In other words. defendant's contention is, as expressed by Judge Kohlsaat in the case of *McCulloch v. Ayer*, 96 Fed. 178: "That even if it was the intention of the legislature to impose a duty to construct, irrespective of notice by the inspector, the person upon whom it was intended to impose such duty and the resulting liabilities, was not designated in the statute with certainty and that this court should not inflict such liabilities upon any one where the duty may only be de-

termined by inference that such person was the one "intended by the legislature to be charged with the duty."

To aid the defendant in his contention he brings citations from many authorities. Wharton on Homicide, sections 72 and 73, lays down the general proposition that "When a responsibility exclusively imposed upon the defendant is such that an omission in its performance is in the usual course of events casually followed by an injury to another person or to the state, then the defendant is indictable for such an omission. But the "responsibility must be one exclusively assumed by the defendant. The omission to perform acts of mercy even though death to another result from such omission is not within the rule."

So far no decision of a court of final resort of this country has been referred to in this opinion in which the doctrine for which the defendant contends has been applied. But in the case of *Maker v. The Slater Mill & Power Co.*, 15 Rhode Island, 112, 23 Atl. 63, the identical question here under discussion comes frankly under the observation of the court; and, as that case is directly in point and of considerable importance, I deem it advisable to consider it at length.

First, it may be necessary to understand the course of judicial decision which had preceded its determination.

In Rhode Island the history of judicial decision upon this question is properly traceable from the case of *Aldrich v. Howard*, reported in the 7th Rhode Island, page 199, and decided in 1862. This case is cited in all the subsequent opinions of the court. The plaintiff there in an action on the case relied upon an act of the general assembly, passed in 1843, prescribing certain fire limits and prohibiting the erection or maintenance of buildings of a certain size within such limits unless they were composed of non-combustible material.

The declaration alleged that the defendant erected within the forbidden district a large wooden building prohibited by the law to be erected therein, and which structure was within two feet of the plaintiff's dwelling, thereby putting plaintiff's property in danger of destruction by fire. This it was

charged was all done in violation of the statute and the plaintiff asked damages. The law upon which he relied provided:

"Section 1. After the passing of this act no building of any kind whatever which shall be more than eighteen feet high from the ground to the highest point of the roof thereof shall be erected within the limits hereinafter described in the city of Providence, unless such building be constructed of such material and be situated in such manner as hereinafter described." The act also declares that every person who shall erect, construct, add to or continue to use any such building shall be punished, etc.

The court in its decision construes the act as imposing upon any one erecting a building within the fire limits, a duty in regard to adjoining owners and in regard to the public—the duty of building in the manner and of the materials prescribed by the act. The prohibition is imperative upon him if he builds at all to build as the act prescribed and in no other manner; and quite as effectually imposes upon him the legal duty of so building as if the statute had expressed the duty in affirmative form.

In answer to the objection that the penalties set forth in the statute are exclusive of all other penalty the court says: "We have no doubt that when the statute makes the doing or omitting of any act illegal and subjects the offending parties to penalties for the public wrong only, a party specially injured by the illegal act or omission has the right of suing therefor at common law."

In 1878 the act upon which this last decision was based was amended in many material particulars and thereafter a conflagration occurred in a building owned by the Slater Milling & Power Company, in which conflagration a great many persons were injured and many suits were brought.

The first of these suits reported is the case of *Grant v. The Power Co.*, decided in 1884, contained in the 14th Rhode Island, page 380. In this case the court advances to a question nearer to the one at bar because its underlying facts are of closer kindred.

The declaration set forth that the defendant, although sub-

ject to their provisions, neglected to comply with the public laws of Rhode Island, chapter 1688, and in consequence of such neglect the plaintiff was compelled by a conflagration in the building of the defendant to leap from a window in the upper story in order to save his life; that his leg was fractured in the leap and amputation became necessary. The defendant demurred generally.

Section 23 of the new statute provided: ''Every building already built or hereafter to be erected in which twenty-five or more operatives are employed in any of the stories above the second story shall be provided with proper and sufficient, strong and durable, metallic fire escapes or stairways constructed as required by this act, unless exempted therefrom by the inspector of buildings, which shall be kept in good repair by the owner of such building, and no person shall at any time place any encumbrance upon such fire escapes.''

The court points out that the present statute provided not only a punishment by fine for its violation but also, unlike the former law, ordained that the supreme court might now restrain by injunction any violation of the act, and the court in deciding the case, says:

''If the remedy by fine were the only remedy given, the inference would be, as decided in *Aldrich v. Howard,* that it was intended only as punishment for the public offense and the remedy by action on the case in favor of a person specially injured, if such remedy were proper, could not be excluded. But in this respect the case at bar differs from *Aldrich v. Howard,* for in the case at bar there is the remedy by suit in equity which is not purely a public remedy.''

The court also concludes that a large discretion was left by the new act to the public inspector of buildings and that ''evidently the inspector of buildings was mainly relied upon to carry it into effect. The remedy by penal prosecution and the remedy in equity are clearly his only weapons.''

At the following term the case of *Maker v. The Slater Mill & Power Co., supra,* was decided and concerned itself with the same law and the same catastrophe with this addition, that the statutes of Rhode Island, chapter 204, provided

·"That whenever any person shall suffer any injury to his person, reputation or estate by the commission of any crime, or offense, he may recover his damages for such injuries."

Section 22 of this chapter described, however, that such action should not be commenced until after the complaint had been made to some magistrate and process issued, and the case was decided against the plaintiff for the reason that no such complaint had ever been made. The court in this case was called upon by counsel to end a long course of litigation by passing upon the validity of the ordinance itself but it declined to do so, and in declining suggested the questions which would arise in such a consideration. The question here under consideration was not then suggested by the court as being involved. It will be observed that up to this time the supreme court of Rhode Island had determined that in case of the violation of these fire laws, first, when the statute prescribed a public penalty alone, a private action resulted to one damaged; second, when the statute provided a public and a private remedy, the remedies set forth in the statute were exclusive; third, that there could be no civil proceeding under section 21 of chapter 204, unless a complaint had first been formally laid with some magistrate and it had gone no further.

But in the case of *Maker v. The Slater Mill & Power Co.*, *supra*, the plaintiff put himself within the provisions of chapter 204, and the question of the liability of the defendant under the fire statute came squarely before the court for determination, namely: the question whether "the defendant's omission to provide its buildings with fire escapes or stairways as required by chapter 688, is a crime or offense."

The facts were the same as in each of the two preceding cases. The court set forth upon the inquiry thus:

"But upon whom does the duty rest? When is it to be performed and what facts are necessary to constitute a violation of the duty? The plaintiff claims that the reasonable construction of the act puts the duty upon the owner. He argues that as there is an alternative between fire escapes or stairways, the duty must be upon one and the same person,

and that person the owner, because only he could provide stairways.

"We do not see that this is necessarily so. * * * The plaintiff further urges that the defendant in this case is liable because it is both the owner and the party in control.'" Nor does this view find favor with the court. The court argues that it is more reasonable to assume that the act indicates that the requirement is to be discretionary with the inspector, dependent perhaps upon his judgment of danger in a particular case, or of other equivalent provisions for safety. It also indicates that the time for requiring fire escapes is when the inspector requires them.

· The decision of the New York court of appeals in *Willy v. Mulledy*, 78 N. Y. 310, to the effect that the defendant in that case was not permitted to wait until he should be directed to provide a fire escape, and that he is bound to do it of his own accord in such a way as the commissioners should direct and approve, and that it was for the defendant to procure the direction and approval of the commissioners, was cited to the court, and the Rhode Island judges meet the citation by saying that under the law in that case there was no discretion in the commissioners and that there was no power of exemption, and that the owner was bound to provide fire escapes in any event. The duties of the commissioners were simply to direct and approve the kind to be used.

The court concludes: "But upon this fundamental point we think it sufficiently appears that the provisions in regard to fire escapes and stairways are too indefinite and uncertain to impose a criminal liability upon an owner of a building for not providing one or the other before the inspector required it."

Study of the decision fails to disclose whether it was the opinion of the court that if the inspector had in fact required the erection of fire escapes the defendant would be liable; and whether as a matter of fact they hold the declaration bad because of such lack of requirement by the inspector, or whether they hold that the penalty of the statute is actually non-enforceable because the act did not specifically impose the duty upon the owner, there are no decisions referred to by the

court in its opinion, nor are there any cited in the argument of counsel.

But in the case of *Beehler v. Daniels,* 18 R. I. 563, 29 Atl. 6, the supreme court of Rhode Island placed an interpretation upon that decision and say plainly that in the Maker case, the terms of the act were too indefinite and uncertain to impose a criminal liability for non-compliance with the statute, and hence no action could be maintained for such alleged offense.

In addition to the two Rhode Island cases, Judge Kohlsaat in the case of *McCulloch v. Ayer, supra,* Judge Green in *The People v. Davis,*[1] and Judge Landis in a recent case [2] have had under consideration the identical ordinance with which we are now concerned, and each has decided that because of its indefiniteness and uncertainty the ordinance imposed no duty, and its violation involved no civil liability.

It must be conceded that to sustain the indictment in this case it will be necessary for the court to rule directly against these last authorities, and, while the Maker case upon which the others seem to be more or less directly founded, is indecisive, and, as we have seen, almost incoherent upon this question, yet, the formidable array of opinions which follow that decision lends to it a weight which otherwise it might not possess.

Also the case of the *United States v. Mitchell,* 58 Fed. 993, must be added to this list which directly sustains the contention of the defendant in this case. If, however, the subtlety of criticism employed in this last case were to be adopted generally as a canon of construction for city ordinances and even for the statutes, it would invalidate a large number of our existing laws.

If then the doctrine announced in the Maker case and those cases which depend on it is found to be the law governing the case at bar, the ordinance under consideration possesses no effectiveness or force and is without life or substantial value.

Such a conclusion, however, should not be drawn if another reasonable determination can be arrived at which will uphold

[1] See I Ill. C. C. 217, *supra.*—Ed.

[2] *Hunter v. Iroquois Theatre Co.,* U. S. Cir. Ct. N. D. of Ill. (unreported).—Ed.

the ordinance. It is the duty of courts to uphold legislative acts whenever possible rather than to overthrow them. While penal statutes must be strictly construed so as not to include persons or acts not clearly within their terms, yet when the question arises as to whether these acts are to retain life and validity, another principle of law intervenes. *C. B. & Q. v. Jones,* 149 Ill. 361; *Hankins v. People,* 106 Ill. 628; chapter 131, Hurd's Revised Statutes, rule 1.

Even larger consideration in this regard should be given municipal ordinances than to acts of more exalted deliberative bodies. The former laws are in great part framed by persons unskilled in the law and rarely by persons skilled in the preparation of statutes. And yet this class of legislation bears with the greatest directness upon the health, the peace, the comfort and the safety of the inhabitants of municipalities. From the exigencies of the situation these laws will often of necessity be loosely drawn and at times their meaning will be imperfectly expressed. So far from burdening them with hard and restrictive theories of construction, our own court in the case of *Arms v. Ayer,* 192 Ill. 601, thus expresses the rule which obtains in Illinois and which should prevail I think everywhere.

"It must be admitted that the act is loosely drawn," the court says, "but the rule that it is the duty of courts to so construe statutes as to uphold their constitutionality and validity if it can be reasonably done, is so well established that a citation of authorities is needless. In other words, if the proper construction of a statute is doubtful, courts must resolve the doubt in favor of the validity of the law. Statutes and city ordinances providing for fire escapes are usually somewhat general in their enactments, and necessarily so, for the reason that it is impossible for the legislature to describe in detail how many fire escapes shall be provided, how they shall be constructed, and where they shall be located in order to serve the purpose of protecting the lives of occupants in view of the varied location, construction and surroundings of buildings; and hence, so far as we have been able to ascer-

tain, acts similar to the first section of this statute have been sustained in other states though perhaps the question here raised has never been directly presented.''

It is true here that the sections under consideration fail to designate who shall provide the appliances for the theatre, but it must be remembered that the defendant is not charged with any default in the original construction or arrangement of the building in question. It is charged that after the building had been thus imperfectly erected and equipped that he with knowledge of these conditions took it in hand and used it as a theatre. "Any person, firm, company or corporation who violates, disobeys, omits, neglects or refuses to comply with  * * *  shall be subject to a fine," and again "Any builder or contractor who shall construct any building in violation of the provisions of the ordinance shall be liable." How can any person other than the builder or contractor be guilty?

In the case of the *United States v. Van Schaick*, 134 Fed. 592, heard on demurrer in the United States district court for the southern district of New York (otherwise known as the Slocum cases) it was sought to hold Van Schaick, the master of a vessel, for the loss of life consequent on the destruction of the boat, and the basis of the charge against him consisted among other derelictions in his going to sea with his vessel while the same was insufficiently equipped with life preservers and while it was equipped with life preservers which were rotten, insecure and defective. The initial duty of equipping the vessel with life preservers was placed upon the owners by the United States statutes and the master of the vessel was nowhere specifically designated by the law as a person upon whom this duty in any way devolved. Judge Thomas in an able and exhaustive opinion, among other things, says:

"While it is not the duty of the master to equip the vessel with life preservers, and while he may not be chargeable, in the first instance, with the duty of making what would be regarded as a proper inspection thereof, necessary to discover the presence or absence of the qualities and material required by law, yet it is the duty of the master of a vessel, aboard and

in command, to use ordinary observation and inquiry and if thereby, or if from report to him, he has notice of defects either in his vessel or equipment, some diligence is required on his part, tending to the restoration of the defective place or appliance. At least it would be his duty to report the condition, and make requisition for repairs or sound facilities.

"Assume that no life preservers were provided. Could the master, with actual or constructive knowledge, navigate the vessel with impunity? If he knows of some total omission of requisite equipment, itself perilous to human life may he deliberately continue to navigate its vessel, wholly indifferent to any catastrophe that may result therefrom? It is thought that such attitude on the part of the master would not be tolerated. And so, if the master blindly uses what he is proffered, however bad or destructive it may be, or constructively or actually knows of defects and does nothing, he is certainly not performing the duty of a master. It is not the duty of the master to provide the hull of the ship, yet if he navigate his vessel without any care as to the condition of the hull, or with a hole in the bottom, of which he has knowledge, actual or constructive, and she sinks, and death thereby ensues, he would, it is thought, fall within the punishment of section 5344. Much more evident would be his guilt if he caused the hole 'to be and remain' in the vessel. In other words, if he suffered and permitted it to be and remain in such vessel, knowing or enabled to know in the use of ordinary observation of its existence and danger, he would be guilty; and he would likewise be guilty if he caused the defective thing to be on the vessel and to remain thereon. The master's duty requires him to exercise some care to discover both the soundness and safety of the hull and equipment.'"

This reasoning seems unanswerable. Applying it to the present case and testing the situation now involved, what results? Conceding for the moment that because of the indefiniteness of the ordinance no one was charged with the duty of supplying the equipment and appliances therein described, and that no prosecution could be had for the mere ownership or inactive control of the building, what was the situation in

which the defendant found himself before he began using the theatre?

Here was a building constructed and arranged in violation of the law because the ordinance provided that ''No wall, structure, building, or part thereof, will hereafter be built, constructed, altered or repaired within the fire limits of the city of Chicago, except in conformity to the provisions of this ordinance,'' and this building was constructed admittedly in violation of the terms of the ordinance. Also some one had offended against the law in its erection because the penalty clause provided that ''any builder or contractor who shall construct any building in violation of the provisions of this ordinance shall be liable.''

There, then, was a building erected in violation of the law which the defendant desired to use for the purpose of an assembly hall. Granting that there was no obligation upon him either as agent, owner, lessee or manager to arrange the theatre in conformity with the ordinance, had he no further duty in the premises? It seems to me there was a plain one, to-wit: The obligation to refrain from using it as a theatre, and if he insisted upon so using it, knowing of its unlawfully defective and dangerous condition, did he not come within the direct inhibition of the penalty clause of the ordinance which enacted, ''Any person, firm, company or corporation who violates, disobeys, omits, neglects or refuses to comply with the provisions of the ordinance shall be subject to a fine?'' But, pursuing the argument further, may it be fairly said that the ordinance in question is defective in its provisions?

Classes IV. and V. are thus defined in the ordinance: ''These shall include all buildings used as assembly halls, etc.'' Suppose we simply transpose the language of the ensuing paragraph from ''there shall be over the stage of every building of Class V. a flue pipe, etc.,'' to ''there shall be no building used as an assembly hall unless there be over the stage thereof a flue pipe, etc.,'' would it be insisted that the indictment here did not charge an offense: that he who used the building without the flue pipe did not disobey the ordinance. The mere change from the affirmative form to the

negative form of expression would do no violence to the rules of interpretation. *Aldrich v. Howard, supra.* And yet if this is allowed the ordinance stands with its intent clearly expressed and the obligations plainly defined, a valid, enforceable law. As we have seen, it is the duty of the court to favor a construction which shall uphold the law rather than one which will take from the law its force and efficacy, and are we not then after considering all parts of the ordinance together, obliged to the conclusion that all persons were forbidden to use the building in question without complying with the requirements of the fire ordinance under pain of the punishments therein devised. And so it seems to me clearly that the weight of reason is in support of the indictment so far as this question is concerned. However, if even this reasoning be not well founded, or if it be overborne by the weight of authority brought against it, still I am convinced that the objection to the indictment is not well taken.

On two other occasions a similar question has been before our own supreme court. The first of these instances is recorded in *Landgraf v. Kuh,* 188 Ill. 484.

The case of *Landgraf v. Kuh,* was an action of trespass on the case brought against the defendants because of their failure to provide a certain building, owned by them and situated in the city of Chicago, where the deceased was engaged in work, with sufficient and proper means of egress, ladders and fire escapes, by reason of which the plaintiff's intestate was killed. There was in force at the time an act relating to fire escapes for buildings wherein it was provided, section 1, "that all buildings in this state which are four or more stories in height, except such as are used for private residences exclusively, but including flats and apartment buildings, shall be provided with one or more metallic ladder or stair fire escapes * * * the number, location, material and construction of such escapes to be subject to the approval of the * * * board of county commissioners," etc.

Section 2 of the act provided that "all buildings of the number of stories and used for the purposes set forth in section 1 of this act which shall be hereafter erected in this

state, shall upon or before their completion each be provided with fire escapes.''

Section 3 provided for giving of notice by the authorities to ''the owner or owners, trustees, lessee, or occupant of any building,'' etc., not provided with such fire escapes, commanding, ''such owners, trustees, lessee or occupant of either of them, to place or cause to be placed upon such building, such fire escape or escapes'' within a certain time.

Section 4 provided that any of the persons so served with notice who shall not within thirty days comply with the notice shall be subject to a fine.

It will be observed that neither section 1 nor any other section of the act in terms put a primary duty upon either owner, trustees, lessee or occupant to provide fire escapes. And it was urged there as it is claimed now, such duty could not arise from mere inference; and ''the statutes of this state impose no duty upon the owner of a building to provide fire escapes. ''Even conceding'' the defendant said, '' (which we do not) that the building was a building for manufacturing purposes then the statute does not impose a duty upon the owner of the fee but upon the owner of the factory.'' But the supreme court decided against all these contentions. It held that the owner of the fee is liable because of the inference arising from the fact that these appliances were to be put on when the building was completed. The court also intimates that any person to whom it is provided in the law notice may be given is liable without the notice, for the court says: ''The fact that the buildings are to be provided with fire escapes 'upon or before their completion' indicates that the duty of providing such fire escapes devolves upon the owners of the buildings. The fire escapes are required to be a part of the construction of the building itself; moreover the notice commanding such fire escapes to be placed upon the building is required by section 3 to be given to 'the owners, trustees, lessee or occupant, or either of them.' The injunction being in the alternative the notice may be given to the one as well as to the other and therefore to the owner as well as to the lessee or occupant. We are therefore of the opinion that the apel-

lees were not relieved from liability in regard to the placing of fire escapes upon their building because the fourth floor of the premises, where appellant's intestate was at work at the time of her death was in the possession and under the control of the tenants or appellees instead of being directly in the possession of appellees themselves.

While in direct terms the supreme court in that case does not determine the question herein presented, yet this is accomplished by necessary implication, for the liability of the appellees under the law is sustained, nor is the liability limited to the owner of the fee by the decision, but in the opinion it is clearly foreshadowed that this liability extends to "the owner as well as the lessee or occupant."

When we come to consider this case in connection with that of *Arms v. Ayer*, 192 Ill. 601, it seems to me that all question disappears as to what the law is now on that point in this jurisdiction. The latter case was an action by an administrator for the death of her intestate resulting from injuries sustained, it was alleged, through the violation of the fire escape act, approved May 27, 1897.

That act was quite as impersonal in its creation of obligations as is the present ordinance. Section 1 of the act provided, that within three months next after the passage of this act all buildings, etc., shall be provided with metallic fire escapes "provided that all buildings more than two stories in height used for manufacturing purposes * * * shall have at least one ladder fire escape for every fifty persons and one such automatic metallic escape or other device for every twenty-five persons," etc.

It will be observed that this section contains no reference to who shall provide this apparatus or be responsible for buildings yet to be erected. Section 4 provides that it shall be the duty of said inspector of factories to serve a written notice upon the owner or owner's trustees or lessees or occupant of any building commanding him to comply with this law. Section 5 provides that in case such person so served shall not within thirty days thereafter comply with its demand he shall be punished. This law was practically, it will be noticed, the

same as the ordinance now under examination in all the features which are being criticised. The declaration was in ten counts, in four of which the statutory notice was alleged to have been given the defendants, while in the other six that allegation was wanting. The defendants were charged as owners, lessees, and with being in possession and control of the building. A demurrer was sustained to each count in the court below, and the upper court was called to examine the sufficiency of each count.

The objection being urged to the ordinance in the case at bar was then as strenuously urged to the statute. "Here then," says the appellee Ayer, upon page 51 of his argument, "is an act which imposes a new obligation, *but fails to point out with certainty on whom the obligation rests* or to prescribe the rule by which in a given case *he* is to be ascertained." The italics are copied.

The appellant began his argument with the statement, "The principal question and perhaps the only question which your honors will consider as of any moment is, whether or not the statute in question is void because the first section does not name specifically on whom is placed the duty of putting fire escapes on buildings over four stories in height."

The appellees argued that the statute must be strictly construed. The case of *Beehler v. Daniels,* 18 Rhode Island, 563, 29 Atl. 6, evidently had not come under their observation so they construed the Maker case as deciding that the liability depended upon the service of the statutory notice. They say, "even though it is assumed that the law is capable of enforcement, no one can be held liable for non-compliance therewith, until the inspector of factories has served the notice required by the act." And they cite in support of the proposition, *Maker v. Slater, supra, Grant v. Slater, supra, McCulloch v. Ayer, supra, Schott v. Harvey,* 105 Pa. 222, and the other Pennsylvania cases.

The court says in its opinion: "It is said that 'Even though it is assumed that the law is capable of enforcement, no one can be held liable for the non-performance therewith, until the inspector of factories has served the notice required by

the act.' With this contention we cannot agree. It is true
the first and second sections do not say who shall provide the
fire escape, but we thing the fair and reasonable intendment is
that the owner or owners shall perform that duty and we so
held in construing the fire escape act of 1885, the provisions
of which in this regard are the same as the act under consid-
eration in the recent case of *Landgraf v. Kuh*, 188 Ill. 484.
The language of section 6, 'who shall be required to place
one or more fire escapes upon any building or buildings under
the provisions of this act,' does not mean, who shall be re-
quired by the inspector of factories, but who shall be re-
quired by the act. The duty to provide fire escapes upon
buildings described in section 1 does not depend upon the per-
formance of any duty by the inspector of factories.'' The
court then proceeds to quote with approval from the case of
*McRickard v. Flint*, 114 N. Y. 222, 21 N. E. 153, and from
*Willy v. Mulledy*, 78 N. Y. 310, two cases directly hostile to
the position taken by the defendant in this case.

The court then continues, and it seems to me that now its
language becomes conclusive upon the question before us:
''When the act went into effect,'' it says, ''it was the duty of
every owner, trustee, lessee or occupant in the actual control
of any building within the description mentioned in the first
section in obedience to section 6, to file in the office of the in-
spector of factories a written application for a permit to erect
or construct fire escapes, and if these defendants failed to do
so, as alleged in the several counts of the declaration, and in-
jury resulted from their failure to place the required fire es-
capes in the building described, they incurred a liability to the
person injured and cannot escape that liability merely be-
cause they may not have been designated by the inspector of
factories as the persons upon whom the duty was imposed to
comply with the law. In other words, the law imposed upon
them the performance of the duty and the action of the in-
spector of factories  *  *  *  is only made necessary in case
they failed to do that duty. It has been held that the term
'owner' in similar statutes does not mean the owner of the fee
but may mean the lessee in actual possession and control of

the building; but we are not aware that any court has held such laws invalid because of their failure to definitely designate who should be liable. We think it clear that under this statute the owner is primarily liable for a failure to perform this duty.'' Thus it must be considered that the supreme court of our own state, in passing upon a statute strikingly similar to the one set forth in this indictment holds that the mere omission to specifically designate the person upon whom the duty of furnishing the appliances and requirements devolves, does not render the statute inoperative but that under the statute then in question that duty devolved at once upon the owner and without the notice provided for in the statute, and that a civil liability for failure to comply extended to the lessee, trustee or occupants in the actual control of any building within the description mentioned in the first section of the statute.

This conclusion finds substantial support in the following decisions outside of our own state. *Willy v. Mulledy,* 78 N. Y. 310; *Rose v. King,* 49 Ohio St. 213, 30 N. E. 267; *McRickard v. Flint,* 114 N. Y. 222, 21 N. E. 153; *State v. Whitaker,* 160 Mo. 59, 60 S. W. 1068; *Hayes v. Michigan Cent. R. R.,* 111 U. S. 228.

It is next objected, and many authorities are brought to the attention of the court on the proposition that the ordinance is invalid because it requires the approval of a non-official body. It is provided in one section of the ordinance that ''The entire sprinkler equipment to be approved by the commissioner of buildings, fire marshal, and the board of underwriters of Chicago.'' There can be no doubt but what the requirement in regard to the board of underwriters is void, and it is claimed that this provision affects the whole ordinance and renders it void.

Also it has been often decided that ''wh- e an ordinance is entire, and each part has a general influence over the rest, and one part of it is void, the entire ordinance is void. The void part of the ordinance makes the whole ordinance void, if the void and valid parts are so connected as to be essential to each other.'' *Cicero Lumber Co. v. Town of Cicero,* 176 Ill. 21.

But if the invalid part can be separated from the other provisions of the law and the purpose and intent of the legislature remains plain and effective, then the invalid part may be altogether disregarded. *C. B. & Q. R. R. v. Jones, supra.* It does not seem to me that this provision requiring the approval of the board of underwriters is at all necessary to the meaning or effectiveness of the ordinance and that it may be omitted without impairing in any degree the purpose or usefulness of the law. Therefore, this provision may be disregarded and the law considered as if this requirement had never been, leaving only the sound parts of the statute intact.

It is elementary that even if an injury may follow the commission of a wrongful act, still if the wrong be not the direct and proximate cause of the injury itself, that no liability results to the wrong-doer. *Causa proxima non remota spectatur,* is the maxim. And in this case it is strenuously argued that the fire and not the lack of saving appliances, was the direct and proximate cause of the death of Viva R. Jackson.

Many authorities are cited in support of that contention. Thus in a Kentucky case a tenant was sued for removing water pipes from the leased building, it being charged that because of such removal it became impossible to extinguish a fire which afterwards occurred. But the court said:

"It seems to us that to make the appellees liable for the destruction of this building there must be some proof showing that the act of disconnecting and removing the pipes was the cause of the destruction of the building: and as this removal had been done some time and no fire had happened, and in the absence of proof that if the pipes had been in perfect order, the engine and pumps would have worked * * * and that all that having been done it would of necessity have saved the building, the damage is entirely too problematical and speculative to permit a recovery. The acts of negligence complained of are too remote." *Stone v. Boston & A. R. Co.,* 171 Mass. 536, 51 N. E. 1; *Franke v. Head,* 19 Ky. L. Rep. 1128, 42 S. W. 913.

In *Stone v. Boston R. R.,* a teamster not connected with the defendant dropped a lighted match underneath the defendant's freight platform. The platform was loaded with oil

which, contrary to law, had been standing there for more than forty-eight hours. In the conflagration which ensued plaintiff's buildings situated across the way were destroyed. It was held in an action for the loss of the buildings that the fire and not the illegal storing of the oil on the defendant's platform was the proximate cause of the destruction of plaintiff's buildings. And in deciding the cause the court says:

"The rule is very often stated that in law the proximate and not the remote cause is to be regarded; and, in applying this rule it is sometimes said that the law will not look back from the injurious consequences beyond the last sufficient cause. * * * It cannot, however, be considered that in all cases the intervention even of a responsible and intelligent human being will absolutely exonerate a preceding wrong doer. Many instances to the contrary have occurred and these are usually cases where it has been found that it was the duty of the original wrong-doer to anticipate and provide against such intervention because such intervention was a thing likely to happen in the ordinary course of events."

These two cases out of the multitude offered sufficiently illustrate the claim of the defendant, but it seems to me that the supreme court of this state has in *Landgraf v. Kuh, supra,* determined also the question. The court says:

"It is further claimed on the part of appellees, that the absence of a fire-escape, if it was a cause of the injury which resulted in the death of the appellant's deceased, was only the remote, and not the proximate cause of such injury. It is said, that appellant can not fasten any liability upon the appellees, unless she not only shows omission by appellees of a duty, but unless she also shows that such omission of duty was the direct and proximate cause of the accident complained of. It is often difficult to determine whether the cause of an injury is the remote or the proximate cause thereof. Where, in the absence of a fire-escape, a person in a burning building is destroyed by the flames, it is unquestionably true that the fire is the proximate cause of the death, but yet it cannot be said that the absence of the fire-escape is not, in the view of the law, a proximate cause, if the presence of such fire-escape

would have prevented the death. So, if a person in a burning building where there is no fire-escape or non-accessible, is forced to seek escape from the building by descent from a ladder or otherwise, it may be a question whether the defective condition of the ladder, or its unskillful use, is, in such a case, so far the proximate cause of the accident as to make the absence of the fire-escape merely a remote cause. Certainly, the effort to escape in some other mode than by a fire-escape might be directly caused by the absence of such fire-escape. But we do not wish to be understood as expressing any opinion upon the question, whether the obstruction of the double window communicating with the fire-escape, or an accident in connection with the use of the fireman's ladder, was the proximate cause of the death of appellant's intestate, or not. What we decide is, that the question, what is the proximate cause of an injury, is ordinarily a question to be determined by the jury under the instructions of the court. In *Fent v. Toledo, Peoria & Warsaw Railway Co.*, 59 Ill. 349, we said (p. 362) : ' We understand * * * the position of counsel for appellee to be that, if fire is communicated from a locomotive to the house of A. and thence to the house of B. it is a conclusion of law that the fire sent forth by the locomotive is to be regarded as the remote, and not the proximate cause of the injury to B.; and the railway company is, for this reason alone, to be held not responsible. This rule we repudiate as in the teeth of almost numberless decisions, and as unsupported by that reason which is the life of the law. We hold, on the contrary, * * * that it is in each case a question of fact, to be determined by the jury under the instructions of the court. * * * If the fire is the consequence of the carelessness of the railway company, and the question of remote or proximate cause is raised, the jury should be instructed that, so far as the case turns upon that issue the company is to be held responsible, if the loss is a natural consequence of its alleged carelessness which might have been foreseen by any reasonable person, but is not to be held responsible for injuries which could not have been foreseen or expected as the results of its negligence or misconduct.' In *Milwaukee, etc.,*

*Railway Co. v. Kellogg*, 94 U. S. 474, it was said: 'The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it.' (*Ford v. Illinois Refrigerating Co.*, 40 Ill. App. 222)."

The defendant is accused of involuntary manslaughter, that is, the killing of a human being, in the commission of an unlawful act, or a lawful act done without due caution or circumspection. The crime is further defined by the statute as the killing of a human being without any intent to do so, in the commission of an unlawful act, or a lawful act which probably might produce such consequences in an unlawful manner.

Now, it must be conceded at once that the mere violation of a city ordinance or even of a statute notwithstanding death ensues during the violation and in connection therewith, does not of itself render the law-breaker liable to punishment for manslaughter.

In *Commonwealth v. Adams*, 114 Mass. 323, one who while violating a city ordinance against fast driving, drives over another, is not guilty of criminal assault and battery merely because of his violation of the ordinance.

In *Potter v. State*, 162 Ind. 213, 70 N. E. 129, the defendant at the time of the homicide was unlawfully carrying a pistol in violation of the statute. During a friendly scuffle the pistol was accidentally discharged and a person was killed, and the court says that, "It is undoubtedly true as a general rule of law that a person engaged in the commission of an unlawful act is legally responsible for all the consequences which may naturally or necessarily result or flow from such unlawful act. But before this principle of law can have any application under the facts in the case at bar, it must appear that the homicide was the necessary or natural result of the act of appellant in carrying the revolver in violation of the statute. * * * The mere fact that the accused was unlawfully carrying the weapon in question at the time it was accidentally discharged is not under the circumstances a material element

in the case, for it is manifest that such unlawful act did not during the scuffle between the parties render the pistol any more liable to be discharged than though the carrying thereof had been lawful."

Again, the court says in its opinion: "It is not charged in the indictment in this case that the homicide resulted from the reckless, careless or negligent manner in which appellant was using or handling the pistol at the time it was discharged. Consequently under the pleading, even though the facts could be said to justify or sustain such a charge, the case is not brought within the rule of culpable negligence as affirmed, and enforced in *State v. Dorsey, supra,* where the defendant was charged in the indictment with having carelessly and negligently run a locomotive engine into a passenger car, thereby killing a person who was a passenger thereon."

Nor would the mere fact that a person unlawfully attempted to pass through a toll-gate without paying his toll, and while so doing caused the death of another, render the offender guilty of manslaughter. Such act done in the exercise of due care is at worst *malum prohibitum,* in itself devoid of dangerous tendency, and therefore not criminal. But it was said that "if the unlawful act were done under conditions dangerous to the toll-keeper; as, if he drove through the gate at a rapid pace, or urged his team of mules on after they had been seized by the deceased, or if from their known fractiousness it was dangerous to stop them—the criminality consisting of two elements, the unlawfulness of the act and the unlawfulness and danger in the mode of its execution," the defendant would be criminally liable. *Estell v. State,* 51 N. J. L. 182, 17 Atl. 118.

However, in the case of *The People v. Pearne,* 118 Cal. 154, 50 Pac. 376, the supreme court of that state held that in a case charging fast driving in violation of an ordinance by reason of which driving a person was killed, that the ordinance did not strengthen the case of the people, but left the case just where it stood before, upon the actual occurrences, as to whether the act was done with "due caution and circumspection." Nevertheless the law upon this question seems reason-

ably clear from the authorities, and it may be thus summarized:

The defendant can only be held liable criminally for the consequences, not intended of an unlawful act: First, when the act or omission is in its nature a wrongful act independently of the enactment, such as breaches of public order injurious to person or property, outrages upon public decency or good morals, and the like. Or, second, when the natural consequences of the unlawful act or omission are dangerous to life or limb, which last clause may after all be included within the term *malum in se*.

Suppose, however, that the act complained of here was not *malum in se*, then was it in its natural consequences dangerous to life?

It must be remembered both in the consideration of this question and the consideration of the question of proximate cause that the ordinance supposes always a fire to have happened before its provisions will be of avail. The persons for whose benefit the law was enacted are always in danger and the apparatus and appliances mentioned in the ordinance are commanded to be supplied them in their then situation, to relieve them of their peril.

Does it require more than the mere statement of this feature of the law in question to establish that the natural consequences of an omission to perform its commands will be fraught with danger to life and limb? If, as stated in the Potter case, "a person engaged in an unlawful act is legally responsible for all the consequences which may naturally or necessarily flow or result from such unlawful act; is not the person charged with the duty of supplying fire escapes responsible for the injury caused to persons by reason of his failure to supply them?

Contending for the sake of the argument even that the ordinance in question has not the dignity or force of a public law but, it placed a positive duty upon the shoulders of the defendant which is as high at least in character as the duty created by contract, and the natural and probable result of a failure to perform that duty, it must be assumed, as we have seen, for the purposes was a danger to life. And it

would seem incontrovertible that the wrong-doer is responsible for such omission.

But if this conclusion be wrong, then there is another consideration which disposes of the objection: Though a violation of the ordinance in question in the manner charged, may not constitute an unlawful act within the meaning of the statute even though its natural consequences were dangerous, yet there can be no question but what the omission makes *prima facie* a case of negligence.

It has been held repeatedly by the supreme and appellate courts, that a failure to observe a statutory precaution, or one created by municipal ordinances, raises a *prima facie* case of negligence.

In the recent case of the *United States Brewing Co. v. Stoltenberg*, 211 Ill. 531, our supreme court says: "The violation of a statute is *prima facie* evidence of negligence. This is also true as to the violation of a city ordinance where the ordinance is such a one as the city is authorized by its charter, or by statute, to make. The ordinance when passed by a power conferred by statute, has the force and effect of the statute. (*Morse v. Sweenie*, 15 Ill. App. 486; *Penn. Co. v. Frana*, 13 Id. 91, and authorities cited). * * * Inasmuch, therefore, as the city council of Chicago had the power to pass the ordinance, set up in the additional count, and introduced in evidence in the case at bar, such ordinance has the force and effect of a statute."

The court then cites in support of its position *Channon v. Hahn*, 189 Ill. 28; *True & True Co. v. Woda*, 201 Ill. 315, and many other authorities.

Then if it is assumed that this omission to supply the apparatus and appliances described in the indictment was negligent, who is to say whether this negligence failed of the due caution and circumspection required by law? Surely not the court, in the face of the charges made in this indictment. The indictment charges in each count that upon the stage there were a great many lights and draperies, borders and curtains and that the latter were highly combustible and inflammable and that if the equipment called for by the ordinance had been provided, Viva R. Jackson would have been saved.

So it seems to me that under the charges of the indictment all of which are admitted to be true, that in the view most favorable to the defendant there is a question for a jury to pass upon, and that it is conclusively established that it is for a jury to determine whether his omission to provide the equipment constituted a lack of due caution and circumspection within the meaning of the statute.

There are several minor objections presented against the indictment which I do not deem important. On the whole the indictment seems to me to present a state of facts which if true at least raises a charge triable by a jury. The motion to quash is overruled as to the first, second, third and fourth counts, and is sustained as to the fifth and sixth counts.

With the truth or falsity of the charges, with the manifest difficulty of proof, this opinion, of course, has nothing to do; for the purposes of this motion, all the charges in the indictment are admitted to be true. I have arrived at these conclusions with diffidence and after great labor, realizing fully as I do the seriousness of the cause both to the people and to the defendant, the difficulty of the questions presented and the high authority of the courts from the opinions of which I have been obliged to differ.

The great industry and ability of counsel engaged, combined with the intense interest they have taken in the controversy have lightened the labors of the court and greatly facilitated his research.